MAINE LUMBER COMPANY, LTD., Appellant, *v.* MARYLAND CASUALTY COMPANY, Respondent, Impleaded with TAZEWELL TIMBER CORPORATION and Another, Defendants.

First Department, March 19, 1926.

Principal and surety — action on bond given by defendant surety company to plaintiff guaranteeing performance of contract attached thereto — contract was for sale of lumber to be manufactured by principal — contract provided for advances to principal by plaintiff to apply on sale price and provided that defendant surety company might complete on default by principal — full sale price was advanced but small part only of lumber was delivered — receiver was appointed for principal — bond was one of surety and not indemnity — plaintiff was not required to go into open market and buy lumber — advances made were on sale price — foreclosure by plaintiff of lien on lumber not within contract and application of proceeds to indebtedness did not release defendant surety company — plaintiff is entitled to damages up to amount of bond, represented by money advanced and difference between contract price and market price. on lumber not delivered less contract price of lumber delivered and amount received on lien.

A bond given by the defendant surety company to the plaintiff which guaranteed the performance of a contract for the manufacture and sale of lumber by the defendant lumber company, which contract providing for advances by the plaintiff against the sale price of the lumber was attached to and made a part of the bond, was a bond of surety and not one of indemnity.

Accordingly, the plaintiff was not required, on the failure of the defendant lumber company, following insolvency and the appointment of a receiver, to complete the contract, to go into the open market and actually buy lumber to take the place of that which the defendant lumber company failed to deliver, in order to show damage sustained.

The advances made by the plaintiff to the defendant lumber company under the contract were on account of the sale price stipulated in the contract, and since the full amount thereof was ultimately advanced by the plaintiff it had paid the full sale price of the lumber prior to the defendant lumber company's failure to deliver the major part thereof.

The fact that the plaintiff foreclosed a lien which it had on lumber that was not within the contract and applied the proceeds therefrom to reduce the liability of the defendants, did not release the defendant surety company from its obligation on its bond on the theory that there was an alteration of the contract.

Since the bond is one of surety for the performance of the contract, the plaintiff is entitled to recover the damages it suffered by failure of the defendant lumber

company to furnish the lumber as agreed, represented by the money advanced and the difference between the contract price and the market price of the lumber that was not delivered, less the amount received on the lien and the contract price of the lumber actually delivered, but the plaintiff's recovery is limited to the amount stipulated in the bond.

APPEAL by the plaintiff, Maine Lumber Company, Ltd., from a judgment of the Supreme Court in favor of the defendant Maryland Casualty Company, entered in the office of the clerk of the county of New York on the 12th day of December, 1924, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the 15th day of December, 1924, denying plaintiff's motion for a new trial made upon the minutes.

*Robert B. Honeyman,* for the appellant.

*Edward J. Dowling* [*Jacob J. Alexander* of counsel], for the respondent.

MERRELL, J. The action was brought to recover the sum of $86,000 upon a bond given by the respondent, Maryland Casualty Company, to secure the performance by the defendants, Tazewell Timber Corporation and W. & S. Job & Co., Inc., hereinafter referred to as the Tazewell Corporation, of a contract with the plaintiff. The plaintiff, appellant, is an English corporation, having its principal office at Liverpool, Eng. The Tazewell Timber Corporation was organized in March, 1920, in the State of Virginia. It acquired a tract of timberland of approximately 5,600 acres and had entered upon lumbering operations thereon. At first the Tazewell Timber Corporation manufactured lumber by the rather primitive means of a circular-saw mill. Desiring to increase its output it began, in July, 1920, to erect what was known as a band-saw mill. The improved mill was completed in December, 1920. In January, 1921, the Tazewell Timber Corporation entered into negotiations with the plaintiff for the sale of its lumber. A written contract was finally entered into between the parties. The contract was negotiated by means of cable communication. The plaintiff, as a condition to entering into a contract with the Tazewell Timber Corporation, required that the timber corporation furnish a surety company bond for the faithful performance of its contract with the plaintiff. Thereupon the Tazewell Timber Corporation made written application to the defendant, respondent, Maryland Casualty Company, for a bond " guaranteeing performance of contract for delivery of lumber," etc. The written application bore date March 3, 1921. At the time of applying to the respondent for the surety bond, the Tazewell Company had prepared its proposed contract with the plaintiff, appellant, and said contract

was submitted to the respondent surety company with the written application for the bond. The application was upon the surety company's printed form. In the opening sentence of the written application for said bond the Tazewell Timber Corporation stated: "We desire the Company to execute Bond for us in the sum of $86,000.00, running to Maine Lumber Co., Ltd., and in such form as may be satisfactory to you and the obligee, * * *."

As particulars regarding the nature of the bond, the application stated: "Guaranteeing performance of contract for delivery of 800,000 feet of prime oak, poplar and chestnut at $60.00 per M and 1,000,000 feet of #1 Common and Selects at $38.00 per M feet F. O. B. cars N. & W. Ry. Siding Burkes Garden, Virginia."

The bond for which the timber company applied was executed by the respondent, and together with the proposed contract, which, until then, the plaintiff had never seen, was then sent to the plaintiff at Liverpool, where the contract was executed by the plaintiff and returned to New York in the latter part of March, 1921. The defendant W. & S. Job & Co., Inc., a New York corporation, joined with the Tazewell Timber Corporation in making said contract with the plaintiff, and the bond of the respondent, Maryland Casualty Company, as surety, joins both the Tazewell Timber Corporation and W. & S. Job & Co., Inc., as principals. The contract thus entered into between the plaintiff and the defendants, other than the respondent, was for the purchase by the plaintiff from the Tazewell Timber Corporation of 1,800,000 feet of lumber of certain specified grades at a total price of $86,000. Delivery of the lumber was to be F. O. B. cars at Burkes Garden, a railroad siding some five or six miles from the mill of the defendants. As to the manner in which payment for the lumber thus sold and to be delivered to the plaintiff was to be made, the contract provided that the plaintiff was to advance to the Tazewell Timber Corporation and its associate, W. & S. Job & Co., Inc., from time to time as requested, amounts sufficient to meet the payrolls and current bills of the lumber manufacturers. Such advances were to be made by the plaintiff by accepting upon presentation drafts or trade acceptances drawn by the Tazewell Timber Corporation or by payment of cash or assignment of customers' trade acceptances as might be mutually agreed upon between the parties. The contract further states that such advances on drafts were to be debited by plaintiff to a special account with the Tazewell Timber Corporation and W. & S. Job & Co., Inc. Shipments of the lumber were to be made on orders of the plaintiff and were to be credited by the plaintiff against such advancements made by it and when the amount of lumber shipped was equivalent to the

amount advanced, thereafter the lumber manufacturers were to draw at sight with documents attached to cover the amount of each shipment. The lumber when first manufactured and as it came from the mill required seasoning and it was necessary to stack the same for three or four months before shipment was made. It was thus necessary for payment to be made by advances against shipments after the lumber had been seasoned. Upon the execution of the contract the Tazewell Timber Corporation and its associate commenced the manufacture of the lumber for the plaintiff. The lumber was placed for the purpose of curing in the Gratton Storage Company, a company organized for the purpose of carrying out the provisions of the contract which provided that the plaintiff should have a lien for due performance of the contract and the repayment of the advances made thereunder upon all cut logs then on the premises of the timber company and upon any logs thereafter cut during the term of the contract, and also upon all manufactured products of said logs until the manufactured lumber was placed aboard cars at the railroad siding at Burkes Garden, Va. The Tazewell Timber Corporation requested of the plaintiff advances from time to time in the months of April, May and June, 1921, pursuant to the provisions of the contract. Drafts and trade acceptances were drawn by the Tazewell Timber Corporation and the same were accepted by the plaintiff, appellant. These acceptances were used by the timber corporation in the ordinary course of business and were negotiated through the Greenwich Trust Company. In all, the advancements and trade acceptances thus made by the plaintiff aggregated $86,000, the entire purchase price of the lumber contracted for. The Tazewell Timber Corporation received from the Greenwich Trust Company in cash upon such trade acceptances the full sum of $86,000. The business enterprise of the Tazewell Timber Corporation was a failure. Its timber turned out to be of inferior quality, and not up to the character of the lumber for which the plaintiff had contracted. Out of 1,000,000 feet of various kinds of lumber which were put into the warehouse of the Gratton Storage Company there were only about 25,000 feet of prime lumber, and 62,000 feet of No. 1 common and selects of oak, poplar and chestnut. This comparatively small amount of lumber up to contract was all that was sufficiently dry and delivered prior to September, 1921. On September 1, 1921, the Tazewell Timber Corporation went into the hands of a receiver. A large part of the lumber manufactured was low-grade, wormy and of different varieties of wood from those called for by the contract. The tract upon which the lumbering was done appears to have been cut over without

regard to the kind of timber cut. Notwithstanding the fact that the plaintiff had advanced the full purchase price of the lumber for which it had contracted of $86,000, there was only delivered to the plaintiff 25,000 feet of prime lumber out of 800,000 feet provided in the contract and 62,000 feet of No. 1 common and selects out of 1,000,000 feet covered by the contract. After the affairs of the Tazewell Timber Corporation were taken over by the receiver the latter made no effort to perform the contract. The contract provided that the lumber covered thereby should be delivered to the plaintiff within eight months from the date of the contract, February 28, 1921. The plaintiff at once applied for an injunction restraining the receiver from shipping any lumber which the defendants had on hand. As soon as the receiver was appointed the Tazewell Timber Corporation notified the plaintiff in writing that it would be unable to perform the contract. The respondent, Maryland Casualty Company, also was notified of the situation at and before the appointment of the receiver, and was requested to look into the matter with a view of carrying out the lumber contract under the provisions of the bond which authorized the casualty company to perform the contract in the event of its principals' default. The respondent took no steps to protect itself or to carry out the contract for which it stood surety.

On August 18, 1921, the plaintiff notified the respondent of the default of its principals and of the fact that the plaintiff would hold the respondent upon its bond. To such notification the respondent replied, by letter dated August 22, 1921, waiving its option under the terms of the bond to complete the work. Action was thereafter brought upon the bond to recover the sum of $86,000, the amount limited by the bond. The evidence shows that the damage suffered by the appellant was far in excess of the amount of the respondent's bond. The complaint herein alleges not only the amount paid by way of advances, but also alleges the damages suffered by the plaintiff by reason of the breach of the contract, measuring such damages by the difference between the contract price and the market price of the lumber covered thereby. Pursuant to its lien upon the manufactured lumber in the possession of the defendants at the Gratton Storage Company's warehouse in Virginia, the plaintiff took proceedings to foreclose its said lien and by order of the court in Virginia the lumber was sold and the net proceeds, amounting to $11,000, were paid over to the appellant. Notwithstanding the payment of the said sum, the evidence shows that the appellant suffered damages still far in excess of the amount of the respondent's bond.

The questions presented by this appeal are as to the nature

of the liability of the Maryland Casualty Company upon its bond, and as to what damages the plaintiff should recover thereunder. The trial court held, and it is the contention of the respondent, that the bond upon which the plaintiff sued was one of indemnity, and that the plaintiff, in order to recover of the surety company, was required to first show that it had paid a loss. The law is well settled that the liability of a surety upon a bond is to be strictly construed and is to be governed by the scope and meaning of the instrument itself. (*Richardson* v. *County of Steuben*, 226 N. Y. 13; *People* v. *Backus*, 117 id. 196; *Bennett* v. *Draper*, 139 id. 266.) In ascertaining the intention of the parties to a contract of suretyship, as in any other contract, the language of the instrument is to be read in the light of the surrounding circumstances. In the case at bar the Tazewell Timber Corporation had acquired a considerable tract of land in the State of Virginia. It had completed a modern band-saw mill. It expected to manufacture a large quantity of lumber, and desired a customer to whom it might sell its product. Not only that, but the Tazewell Timber Corporation required financial assistance. It desired a customer who could and would be willing to advance money against the contract so that the payrolls and current expenses of the timber corporation might be met. The plaintiff was an extensive dealer in lumber at Liverpool, Eng., and was perfectly willing to negotiate with the Tazewell Timber Corporation along the lines suggested. The proposition made to the Maine Lumber Company was that it should purchase a substantial amount of lumber to be manufactured by the Tazewell corporation and which should be stored by it until sufficiently seasoned for shipment. The Maine Lumber Company wanted the lumber and agreed to pay for it in advance, so that the Tazewell corporation might carry on its operations and meet its payrolls and current expenses. The Maine Lumber Company, however, was unwilling to enter into such arrangement unless the Tazewell corporation and its associate, W. & S. Job & Co., Inc., furnished security for the faithful performance of the contract on their part. To meet such demand of the Maine Lumber Company the Tazewell corporation applied, as before stated, to the respondent, Maryland Casualty Company, for its bond as surety for the performance of the contract. The proposed contract was submitted to the surety company and was evidently satisfactory to the casualty company, as it executed the bond in suit, which was forwarded with the proposed contract to the plaintiff for execution at Liverpool, Eng. The Tazewell corporation agreed to pay for the bond a premium of $1,290 per year. The Maryland Casualty Company was fully advised as to what was required of it. It had

before it the proposed contract which was afterward entered into between the parties. There was no ambiguity in regard to the requirement of the Tazewell corporation or as to the character of suretyship assumed by the respondent. The surety company was asked to guarantee the performance by the Tazewell corporation of its obligations contained in the proposed contract with the plaintiff. The surety company accepted the application and issued its bond. The proposed lumber contract was attached to and became a part of the bond " as fully as if recited at length herein." Upon the faith of such surety company's bond guaranteeing performance on the part of the Tazewell Timber Corporation the plaintiff accepted the contract, executed the same, and entered into its performance. Under the terms of the contract the Tazewell corporation was obligated to manufacture, sell and deliver to the plaintiff F. O. B. cars Norfolk and Western railway siding, Burkes Garden, Va., 1,800,000 feet of lumber for a total price of $86,000, said lumber to be delivered within eight months from the date of the agreement. The sole obligation on the part of the Tazewell corporation was to deliver the lumber to the plaintiff. The sole obligation on the part of the plaintiff was to make payment in advance of delivery as requested by the Tazewell corporation " by accepting upon presentation drafts or trade acceptances drawn by the Tazewell," with shipments of the lumber as made to be credited against the plaintiff's advances. Plaintiff fully performed the contract on its part. At the request of the Tazewell corporation the drafts and trade acceptances were made and accepted by the plaintiff between April and June, 1921, to the amount of $86,000. The drafts thus accepted by the plaintiff were payments upon account of the purchase price of the lumber covered by the contract. The full $86,000 was received by the Tazewell corporation and thereupon the plaintiff became entitled to receive the full quantity of lumber in accordance with the contract. The bond in suit was given by the Tazewell corporation as a guaranty for its performance of the contract. Failing to deliver the lumber covered by the contract, the principal breached its contract and for such breach the plaintiff was entitled to recover its damages of the defendant, respondent, such damages, however, being limited by the amount of the respondent's bond. The bond provides that " Tazewell Timber Corporation  *  *  *  as Principal, and the Maryland Casualty Company  *  *  *  as surety are held and firmly bound unto Maine Lumber Company, Ltd. (hereinafter called the Obligee), in the sum of Eighty-six Thousand Dollars ($86,000), for the payment whereof said Principal and Surety bind themselves, *  *  *.''  The bond recites that the lumber contract was annexed

thereto and made a part thereof, " as fully as if recited at length," and then provides: " Now, therefore, the condition of this obligation is such, that if the Principal shall indemnify the Obligee against any loss or damage directly arising by reason of the failure of the Principal to faithfully perform said contract, then this obligation shall be void; otherwise to remain in full force and effect."

It is beyond dispute that the Tazewell Timber Corporation, the principal of said bond, failed to perform its contract with the plaintiff, and that it did not in any way indemnify the plaintiff. It seems to me beyond cavil that the evidence shows that the plaintiff suffered loss and damage by reason of the failure of the Tazewell corporation to carry out its contract far in excess of the amount of the surety company bond. The contract called for the delivery of 800,000 feet of prime lumber at $60 per 1,000 feet. Of this quality of lumber only 25,000 feet were delivered. The market value at the place and time of delivery of this lumber was shown to be $105 per 1,000 feet. For the failure to receive the balance of the 800,000 feet of prime lumber the damages sustained by the plaintiff due to the difference between the contract price and the market price amounted to $34,875. In regard to the other 1,000,000 feet covered by the contract, the evidence showed that the market price of No. 1 common and selects in Virginia was from $55 to $60 per 1,000. The contract price of this lumber was $38 per 1,000. The Tazewell corporation delivered of the 1,000,000 feet only 62,000 feet, and by reason of its failure to deliver the 938,000 remaining undelivered under the contract, the plaintiff suffered damages in the sum of $15,946 based on the difference between the contract price and the market price in Virginia at the time of the breach. The foregoing items were the actual direct losses recoverable by the plaintiff in an action at law upon the contract. Such damage was fairly within the contemplation of the defendant surety company when it executed the bond in suit. But the contract, to secure the performance of which the bond was given, went further. The plaintiff agreed to advance for the lumber upon request, and did actually advance the purchase price of the entire amount covered by the contract, amounting to $86,000. By payment the plaintiff was entitled to receive 775,000 feet of prime lumber worth $105 per 1,000, or $81,375. The plaintiff was also entitled to receive 938,000 feet of No. 1 common and selects at $55 per 1,000, or $51,590, making in all a total of $132,965. Against this the plaintiff received $11,000 upon the foreclosure of its lien in Virginia.

The respondent contends that no damage could arise from defendants' failure to deliver the lumber, unless the plaintiff went

into the open market and actually bought lumber to take its place, and that the damage would then be the price actually paid. This might be so if the bond was one of indemnity, where the liability must have actually been paid to become a loss or damage. We think the respondent is wrong in such contention. The instrument itself clearly shows that the bond was one of surety rather than of indemnity. The undertaking of the respondent in this bond was of suretyship for the performance of the contract by the Tazewell Timber Corporation. The application of indemnity is to the indemnitor's principal, while that of suretyship is to a third party for the default of the principal. The respondent undertook to make good if the Tazewell corporation did not. The primary obligation of the respondent to the plaintiff was the obligation of the Tazewell Timber Corporation under its contract with the plaintiff. The respondent's obligation was to become liable to the plaintiff in case the Tazewell corporation failed to perform its contract with the plaintiff, or to pay any damages sustained by the plaintiff by reason of such non-performance. The bond in suit is a surety bond and not a bond of indemnity. That the surety company so considered it at the time the bond was given is clear from its language wherein the Tazewell corporation and its associate as principal and the respondent as surety are held and bound to the plaintiff on condition that " if the Principal shall indemnify the Obligee against any loss or damage directly arising by reason of the failure of the Principal to faithfully perform said contract, then this obligation shall be void  *  *  *.'' By the terms of the bond the surety company itself reserved the right to perform the contract in case its principal should default. The obligation of the Tazewell corporation was under its contract with the plaintiff and not under the bond. In case the Tazewell corporation should fail to perform its contract with the plaintiff the respondent would become liable for damages, not to indemnify the plaintiff for damages, but to pay plaintiff's damages. (*Maloney* v. *Nelson*, 144 N. Y. 182.) In the case last cited the Court of Appeals said (at p. 186): " In this respect the case differs from those cases where an individual agrees to do a particular thing, such as to pay money to a third party in exoneration and discharge of the original liability of his principal to such third party. In such case it may be conceded that the right of action becomes complete on the defendant's failure to do the particular thing he agreed to do. Thus, if A entered into a bond to pay money to B at a certain time, and C thereupon entered into another bond to A to himself pay that money to B, in such case C becomes liable to pay the money, and the condition of the bond is broken by his failure to pay, and A

has a right of action against C to recover the money, without proof that A has paid his bond to B. But where the real purpose of the undertaking is indemnity against loss or damage to be sustained from a payment by A of the obligation which he has entered into, there the surety to A can be proceeded against and a recovery had from him only upon proof that A has paid the money or some portion of it which he was obligated to pay. Herein lies the difference between this case and that of *Rector, etc., of Trinity Church* v. *Higgins* (48 N. Y. 532). The defendant in that case was the lessee of the plaintiff, and in the lease he covenanted to pay and discharge all the taxes and assessments which should be imposed upon or grow due or payable out or by reason of the demised premises. The defendant failed to pay the amount of two assessments, and the action was brought by the plaintiff without its having paid them, and no evidence was offered to show that any proceedings had been taken by the corporation of the city of New York to enforce their collection. * * * It was held here that the covenant of the defendant was a primary and not a collateral or secondary one in its terms, and that there was no language contained in it which would convey the idea that the plaintiffs were first to pay the assessments before a cause of action arose against the defendant on account of the non-payment thereof; that the covenant was broken when the defendant neglected to pay assessments or taxes duly imposed, and that the defendant was not at liberty to say it was a debt of the plaintiffs, and that the latter must first pay it, and that then defendant would pay them; that it was his own debt, made so by the terms of the covenant."

It is the contention of the respondent that the plaintiff did not actually pay for the lumber. Such is not the fact. Under the terms of the contract the lumber was to be paid for by the plaintiff advancing amounts sufficient to meet payrolls and current bills of the Tazewell corporation. By the terms of the contract these advances were to be made by the plaintiff "accepting upon presentation drafts or trade acceptances drawn by the Tazewell." Such advances or drafts were to be debited by the plaintiff to a special account of the Tazewell corporation and shipments made by it were to be credited against such advancements. In short, the moneys advanced were to be repaid by lumber shipped. There is no dispute in the evidence but that the Tazewell corporation drew on the plaintiff to the amount of $86,000; that the drafts in such amount were accepted by the plaintiff, appellant, and that the Tazewell corporation cashed such drafts thus accepted with the Greenwich Trust Company. There can be no question but that the plaintiff in accepting the drafts became primarily liable to the

holder and that the drawer after acceptance is only secondarily liable. I think it is quite immaterial whether the drafts were paid upon maturity or were renewed. Sooner or later these drafts, amounting to $86,000, accepted by the plaintiff, must be met and paid. There is no reasonable ground for saying that the plaintiff did not pay for the lumber for which it contracted, but which it did not receive.

It is also claimed by the respondent that there was an alteration of the contract because of the fact that the plaintiff accepted and took lumber not of the grade or quality called for thereby. This contention arose from the fact that the plaintiff took possession of such lumber as had been manufactured by the Tazewell corporation and which was in storage at the time the corporation went into the hands of a receiver. The plaintiff acted strictly pursuant to the terms of its contract. Other creditors in Virginia were claiming the lumber in question, but under its lien the plaintiff succeeded in holding the lumber, and the $11,000 received therefrom went to reduce the liability of the defendants. The lumber thus taken by the appellant was not a delivery under the contract, but was taken pursuant to the terms of the contract above mentioned.

I think upon the evidence and the facts established thereby, that the learned court at Trial Term improperly dismissed the plaintiff's complaint and directed a verdict in favor of the defendant. I think the plaintiff, upon the evidence, was clearly entitled to recover the damages which it suffered to the extent of the respondent's obligation upon its bond.

The judgment and order appealed from should be reversed, with costs, and the plaintiff should have judgment against the defendant Maryland Casualty Company for the sum of $86,000, with interest thereon from September 28, 1921, amounting to the sum of $102,398.90, and with costs, together with interest thereon from the date of the entry of the judgment appealed from.

DOWLING, FINCH, MCAVOY and MARTIN, JJ., concur.

Judgment and order reversed, with costs, and judgment directed in favor of plaintiff against defendant Maryland Casualty Company for the sum of $102,398.90, with costs, and with interest thereon from December 12, 1924, the date of entry of the judgment appealed from.